IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| ROBERT DALE ANDREWS and PATTI ANDREWS, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:09-cv-0056 Judge Trauger |
| HICKMAN COUNTY, TENNESSEE, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the court are: (1) a Motion for Summary Judgment filed by the Tennessee Attorney General on behalf of defendants Cynthia Primm, Kelly Davis and Monica Wright (the "State Defendants") (Docket No. 47), to which the plaintiffs have responded (Docket No. 53), and (2) a Motion for Summary Judgment filed by defendants Hickman County and Paul Wade (the "County Defendants") (Docket No. 51), to which the plaintiffs have responded (Docket No. 54), and the County Defendants have filed a reply in support (Docket No. 55). For the reasons discussed herein, these motions will be granted in part and denied in part; all claims against all defendants will be dismissed, except for the Section 1983/Fourth Amendment claims against the State Defendants and Wade.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs, Robert Dale Andrews and Patti Andrews, are residents of Davidson County, Tennessee, but, on the key date for purposes of this case, August 27, 2008, they lived at

1

a residence in Hickman County, Tennessee.[1]  The plaintiffs have eighteen living children, four of whom (teenagers ranging in age from 13 to 17) were living at home with their parents on August 27, 2008.  The reminder of the plaintiffs' children had reached the age of majority and were no longer living with their parents.

On or about August 12, 2008, defendant Kelly Davis, who covers the Hickman County area as an "assessment worker" for the Tennessee Department of Children's Services (DCS), received a "P2" or "Priority Two" referral regarding conditions at the plaintiffs' home from the DCS central office in Nashville, Tennessee.  According to Davis, a P2 referral indicates that an individual, or referent, has reported a dangerous condition at the home but that the child is "safe for the time being," and visitation to the child should be made within 48 hours.  (Docket No. 46 at 23-24.)

After receiving the referral, Davis determined that the address provided in the referral was incorrect and "made several good-faith attempts to try to find the [correct] address." (*Id.* at 27.)  As Davis was not able to readily locate the address, she decided to continue to contact the referent until "the referent told us exactly where the address was.  It wasn't until August 27 that the referent was able to give it to us." (*Id.*)

Shortly after dark on the 27th, Davis, along with fellow State Defendants Primm and Wright (who also serve Hickman County for the DCS) requested the assistance of the Hickman

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 53 Ex. 1, No. 54 Ex. 2, and 56) and related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

County Sheriff's Office in making the site visit.[2]   The Hickman County Sheriff's Department dispatched Deputy Kyle Chessor and Reserve Officer/defendant Wade to "assist" the State Defendants, and the group met in a parking lot near the plaintiffs' home.  (Docket No. 56 at 3.)  Wade had, on previous occasions, been dispatched to assist with DCS investigations and to escort DCS officers to a site visit.  Like the one at issue here, these are basic requests for assistance, without any type of "urgency code or any level of threat code" provided by DCS to the officers.  (Docket No. 56 at 12.)  Defendant Wright testified that Hickman County deputies assist in investigations without court intervention or a search warrant and that the deputies simply rely on what DCS tells them.  (*Id.* at 13.)

While there were no allegations in the P2 referral indicating that the plaintiffs had guns in their home, Davis contacted law enforcement to assist with the site visit because she believed, based upon subsequent conversations with the referent, that there were guns in the home and also because "it was late at night."  (Docket No. 54 Ex. 5 at 57.)  At around 8:30 p.m., the group arrived at the plaintiffs' home, with Wade and Chessor traveling in a marked police car and the State Defendants traveling behind the officers in their own vehicle.

When they arrived in the driveway of the plaintiffs' home, officers Wade and Chessor, in uniform and armed, exited their vehicle and approached Mr. Andrews, who was standing in the

---

[2] On August 27th, a second referral was submitted by the Nashville office to Davis regarding the plaintiffs.  This was a P3 referral, which is less urgent than a P2 referral and dictates that an investigation into conditions affecting the child should be made within 72 hours.  The plaintiffs maintain that this second referral was received by the Nashville office at 11:38 p.m. on August 27th, and, therefore, Davis and her associates in Hickman County would not have received the referral until August 28th.  Indeed, as noted above, it appears from Davis's deposition testimony that the site visit was prompted by a subsequent conversation with the referent on August 27 that revealed the plaintiffs' correct address, not by the second referral.

driveway. It was not possible for the State Defendants, who remained behind, to hear all of the conversation between Mr. Andrews and the officers.

The plaintiffs claim that, during this initial conversation, the officers, when asked for identification, rudely flashed their badges at Mr. Andrews and informed him that DCS officers wanted to talk to him. The plaintiffs claim that one of the officers told Mr. Andrews that he was not allowed to go back into his house without a police escort; they are not certain whether this comment was made by Chessor or Wade. During his deposition, Mr. Andrews first said that he believed that Wade was "the only one doing the talking" but then stated that the "dark headed's one did most of the talking," and, apparently, Chessor has significantly darker hair than Wade. (Docket No. 54 Ex. 9 at 28.)

In response, Mr. Andrews told the officers that his family had been previously threatened and had at least one visit from an individual disguised as a police officer. Following the visit from an individual impersonating a police officer, the plaintiffs had spoken with a sergeant in the Hickman County Sheriff's Department, who had provided his number and told the plaintiffs to call him if they ever needed to confirm the legitimacy of a police visit. In light of this, Mr. Andrews asked the officers "not to come in" and to wait outside so that he could get his wife, who had the sergeant's contact number, and so that, in light of the late hour, he could confirm that his children were available to talk to the authorities. (*Id.*)

Inside, one of the children had informed Mrs. Andrews (her mother) that police officers were outside of the home. Mrs. Andrews called the sergeant to ask whether officers had been dispatched to the house. The sergeant asked to speak with one of the officers to confirm that they had been dispatched.

4

As Mrs. Andrews began to make her way toward the back door to hand the phone to one of the officers, Mr. Andrews came in the back door. The plaintiffs claim that, almost immediately thereafter, one officer followed Mr. Andrews into the house, quickly followed by the State Defendants and the other officer. The plaintiffs claim that the State Defendants "were sandwiched" between the two officers, and, before the plaintiffs could react, the five individuals "flooded" into their home. (Docket No. 54 Ex. 2 at 6, 8.)

At this point, Mrs. Andrews handed the phone to officer Chessor, who confirmed to the sergeant that they had been dispatched to assist DCS. The County Defendants dispute that all five individuals entered the home at the same time; they claim that Officer Chessor initially went inside the house, and Officer Wade stayed outside, except for a brief moment after Chessor and the State Defendants had been in the home for some time. (Docket No. 54 Ex. 2 at 11.) Wade testified that, shortly after the other individuals entered the house, he "just kind of stepped in there and kind of watched what was going on for a few minutes." (Docket No. 54 Ex. 4 at 18.) There was no warrant to enter the home.

Once inside, the State Defendants asked to interview the plaintiffs' children separately, and the plaintiffs, who claim that they feared being arrested or losing their children if they declined, allowed the interviews to take place. Both officers were on the premises while the State Defendants separated the four children into four different rooms and conducted individual interviews with each child. Indeed, the plaintiffs maintain that one officer (it is not clear which one) followed Mrs. Andrews out of the house and sat with her on a porch swing for the balance of the time that the interviews were being conducted, while the other officer stood with Mr. Andrews just outside the front door of the house. Wade testified that both he and Chessor sat on

5

the front porch with the plaintiffs while the State Defendants conducted the interviews. (Docket No. 54 Ex. 4 at 18.)

After the State Defendants finished conducting the interviews, they met the officers and the plaintiffs by the front door of the house and informed the parties that they needed to do a "walk-thru" of the plaintiffs' home. (Docket No. 54 Ex. 2 at 13.) The State Defendants informed the officers that they were not needed for the walk-thru, and the officers left. The parties all recognize that, prior to this point, the officers were not explicitly told to leave the property, although the plaintiffs maintain that Mr. Andrews initially told them that they were not allowed to come inside the home.

Next, the State Defendants conducted a search of the plaintiffs' home, looking in each and every room of the house, primarily for guns and ammunition. According to Mrs. Andrews, they also inspected the kitchen of the house to ensure that there was sufficient food on hand. (Docket No. 54 Ex. 8 at 100.) After conducting the search and apparently being satisfied with the results, the State Defendants left. There were no arrests, charges, or other actions taken by DCS against the plaintiffs as a result of this incident, and, while not entirely clear, it appears that the referral to DCS, while facially legitimate, was made by an individual with personal animosity for the plaintiffs.

On August 26, 2009, the plaintiffs filed this lawsuit, suing Wade, the State Defendants, and a "John Doe" officer (later revealed to be Chessor) in their official and individual capacities, along with Hickman County. (Docket No. 1 at 2.) Pursuant to Section 1983, the plaintiffs alleged that, acting in concert, the defendants had violated their to right to privacy and their right to be free from unreasonable searches and seizures. (*Id.* at 5-6.) The plaintiffs also alleged that

6

Hickman County was liable under Section 1983 because it had a custom that encouraged the violation of constitutional rights and because it had supervised the unconstitutional actions in this case. (*Id.* at 8.) The plaintiffs also alleged that the defendants had engaged in (and conspired to engage in) common law abuse of process. (*Id.* at 7-8.)

On October 21, 2009, the State Defendants moved to dismiss. (Docket No. 14.) In a January 26, 2010 Memorandum, Judge Echols, who was presiding over this case at the time, granted the motion in part and dismissed all claims against the State Defendants except those asserted against the State Defendants in their individual capacities under Section 1983. (Docket No. 31 at 10-11.) While the State Defendants had moved to dismiss the Section 1983 claims on the basis of qualified immunity, the court determined that the factual record was not sufficiently developed to make a determination on the qualified immunity issue and invited the defendants to renew the qualified immunity issue at the summary judgment stage. (*Id.*)

On February 10, 2010, the court denied the plaintiffs' motion for leave to amend their Complaint to substitute Chessor for the "John Doe" officer because the claims against Chessor would now be time barred. (Docket No. 34 at 5-6.) The defendants have now all moved for summary judgment.

## ANALYSIS

I.  **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of

7

material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Qualified Immunity

As discussed herein, the individual defendants all claim that they are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first, determining whether a constitutional or statutory violation occurred, and, if so, then determining if the right infringed was clearly established. *McKinley v. City of Mansfield*, 404 F.3d 418, 429-30 (6th Cir. 2005). However,

8

courts should use their discretion and may consider the issue of whether the right was clearly established first, if such an analysis is appropriate "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

To determine whether a right has been clearly established, courts look to "the federal constitutional, statutory, and case law existing at the time of the challenged action." *Rodgers v. Jabe*, 43 F.3d 1082, 1085 (6th Cir. 1995). In determining whether case law has "clearly established" the right, the court may look to decisions of the Supreme Court, the Sixth Circuit or "other Courts of Appeal." *McKinley*, 404 F.3d at 429.

In order for a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (internal quotation omitted). In qualified immunity analysis, government officials performing discretionary functions are entitled to "the benefit of the doubt." *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996). Therefore, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1999).

Once the defendant claims that qualified immunity applies, it is the plaintiff's burden to demonstrate that the doctrine should not apply – that is, to sufficiently show that a constitutional violation occurred and that the law at issue was "clearly established" by the relevant time period. *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996).

II.     **The State Defendants' Motion**

The State Defendants argue that they are entitled to qualified immunity because they

"acted in an objectively reasonable manner when they conducted an investigation pursuant to [] referrals of alleged abuse by plaintiffs." (Docket No. 48 at 5.) That is, they received a credible referral regarding child abuse, and they investigated the referral professionally. (*Id.*) Again, there are two theories of constitutional liability lodged against the State Defendants here – Fourteenth Amendment and Fourth Amendment.

### A. Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause contains "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," which includes the right of parents to generally control the course of their child's home life and education. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). The Sixth Circuit has indicated that this fundamental right to "familial association" may be violated when the state temporarily or permanently removes children from their parents' home and control, or when parental rights are extinguished, without due process. *Kottmyer v. Maas*, 436 F.3d 684, 691 (6th Cir. 2006). However, the state is permitted to investigate allegations of child abuse without infringing on this "familial association" right, so long as those investigations are not conducted in bad faith, with malicious motive, or employ tactics that "shock the conscience." *Kottmyer*, 436 F.3d at 691, 691 n.1; *Smith v. Williams-Ash*, 173 Fed. Appx. 363, 366 (6th Cir. 2005).

Consistent with this, the Sixth Circuit has extended qualified immunity to state officials who have, in good faith, conducted child abuse investigations without the parents' knowledge or consent. *Williams v. Pollard*, 44 F.3d 433, 434-35 (6th Cir. 1995)(extending qualified immunity to child abuse investigators who conducted lengthy interview with children of plaintiffs at school without parents' knowledge or consent). Also, where an investigator visited the plaintiff's

property (but left when she was asked to do so) and threatened to remove the children from the plaintiff's home if she did not participate in the child abuse investigation, the Sixth Circuit found that the investigator was entitled to qualified immunity because it "is not clear what constitutional rights [were] allegedly violated." *Reguli v. Guffee*, 2010 WL 1252950, *7 (6th Cir. March 31, 2010).[3]

While Judge Echols's Memorandum recognized that the plaintiffs had stated a claim under the Fourteenth Amendment (Docket No. 31 at 8), discovery and subsequent briefing have revealed that the plaintiffs' Fourteenth Amendment claim fails on the "constitutional violation" element of the two-part qualified immunity test.

Again, while parents have a constitutional right to "familial association," a reasonable child abuse investigation that, if necessary, involves interviewing the children outside of the parents' control does not violate that right. *Kottmyer*, 436 F.3d at 691. While the plaintiffs were obviously frustrated and annoyed by a child abuse investigation that was apparently based upon a personal vendetta, there is nothing in the record to suggest that the State Defendants did not simply do their job as far as the actual investigation is concerned. That is, without any way to know the illegitimacy of the allegations, they received a referral and went to the location of the alleged abuse. There, they spoke to the parents involved and conducted brief interviews with

---

[3]In addition to these cases, the State Defendants also point to a series of cases from other jurisdictions that have recognized that, in the child abuse investigation context, the parental rights at issue are somewhat "ill-defined" and, therefore, a finding of qualified immunity for DCS employees who allegedly infringe on those "ill defined" rights to "family integrity" is generally appropriate. (*Id.* at 7-8 citing *e.g. Kiser v. Garrett*, 67 F.3d 1166, 1172 (5th Cir. 1995); *Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992)). The plaintiffs respond, arguing that this, non-controlling, case law is distinguishable or maintaining that the right at issue is more clearly defined than the defendants claim. (Docket No. 53 Ex. 2 at 7-9.)

each of the children in the home, looked through the house to ensure that the children were not in danger, and then they left. There is no evidence that the investigation or interviews were conducted in bad faith or with a malicious motive, or that the conduct here is "shocking" to the conscience. Therefore, on this aspect of the plaintiffs' claim, the State Defendants are entitled to summary judgment.

B. **Fourth Amendment**

As noted above, the plaintiffs have alleged that the State Defendants violated their Fourth Amendment rights through their warrantless search of the plaintiffs' property. (Docket No. 53 Ex. 2 at 7.) In his January 26, 2010 Memorandum, Judge Echols determined that *Jordan v. Murphy*, 145 Fed. Appx. 513 (6th Cir. 2005), among others, clearly established that a social worker, like a police officer, may not enter a home without a warrant or without an applicable exception to the warrant requirement.[4] (Docket No. 31 at 7-8.) Judge Echols suggested that further discovery might show that a warrant had been obtained or that an exception to the warrant requirement (for instance, the search was consensual) was applicable. (*Id.* at 9.)

Rather than offering such evidence, in their motion here, the State Defendants argue that the Sixth Circuit's disposition of the Fourth Amendment claims against a government official in

---

[4] In *Jordan*, the court recognized that neither the Sixth Circuit nor the Supreme Court has "explicitly held that the Fourth Amendment does not create a social worker exception" but assumed that there was no "social worker exception" because "other circuits have so held"; that is, other circuits have concluded that social workers are subject to the warrant requirements of the Fourth Amendment. *Id.* at note 2 (citing, among others, *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003)). Additionally, in his *Jordan* concurrence/dissent, Judge Lawson wrote that "social workers [] must abide by the strictures of the Fourth Amendment when removing a child from a home." *Id.* at 524 (citing, among others, *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) for the proposition that the "removal of children from custody of legal guardian should be analyzed under the Fourth Amendment reasonableness standard").

*Reguli* is dispositive. (Docket No. 48 at 9.) However there, a county employee conducted an interview with the plaintiff's daughter (who was not a party) at the daughter's school, and the plaintiff parent alleged that this interview violated the plaintiff's Fourth Amendment rights. 2010 WL 1252950, *6. The Sixth Circuit simply concluded that the plaintiff had no standing to challenge a violation of *her daughter's* Fourth Amendment rights. *Id.* This holding has little bearing on the present case because the plaintiffs are alleging that their Fourth Amendment rights were violated when their home was searched by the State Defendants. (Docket No. 36 at 6.)

Based upon Judge Echols's previous conclusion that the right at issue is clearly established, the absence of evidence that an exception to the warrant requirement applies, and the undisputed fact that the State Defendants entered and searched the plaintiffs' property without a warrant, it is clear that the State Defendants are not entitled to qualified immunity on the Fourth Amendment aspect of the plaintiffs' claim. Therefore, the State Defendants' motion for summary judgment in this regard will be denied.[5]

---

[5]A further clarifying note on *Jordan* is appropriate in light of the fact that, in that case, the Sixth Circuit concluded that the social worker (Ms. Williams) was entitled to qualified immunity. In *Jordan*, Williams entered the home following detailed discussions with police as to whether there were "exigent circumstances" that justified an immediate (warrantless) entry into the home. 145 Fed. Appx. at 515. Several police officers and Williams concluded that there was an immediate need to enter the home to protect the safety of the children inside from deplorable conditions, and, therefore, Williams followed the officers into the home, remaining on the first floor while the officers searched the house and seized the children. *Id.* While assuming that it was a constitutional violation for Williams to have entered the home without a warrant, the court concluded that Williams was entitled to qualified immunity, because "a reasonable case worker under similar circumstances would have deferred to the police officers' conclusion" about the propriety of entering the house without a warrant. *Id.* at 518. The court held that "law enforcement officers have a duty to make, and are accustomed to making, Fourth Amendment decisions. Case workers should not have to second guess officers' decisions, particularly where the police have told them that children are in imminent physical danger." *Id.*

### III. The County Defendants' Motion[6]

#### A. Officer Wade – Section 1983 Claims

The County Defendants do not dispute that it is clearly established that a police officer, absent an exception, must have a warrant to enter an individual's home. (Docket No. 51 Ex. 1 at 7.) The Supreme Court has long recognized that "physical entry of the home is the chief evil against which [] the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). As Judge Lawson wrote in *Jordan*: "Fourth Amendment jurisprudence firmly establishes the constitutional protections that honor the sanctity of the home," and, absent a warrant, "the public official must establish an exception to the warrant requirement by clear and positive proof." 145 Fed. Appx. at 526-27(internal citation and

---

The court noted that the case worker is obligated to cooperate with police and is entitled to "reasonable reliance on the police officers," and, in light of that, Williams "would not have understood her actions as violating clearly established law." *Id.* Here, the distinctions between the State Defendants and Williams are apparent. First, there is no evidence that the State Defendants deferred to the deputies on the propriety of entering the home – they simply "flooded" in after the deputies. More importantly, the State Defendants conducted a thorough, warrantless search of the house without any assistance from the police; rather, they instructed the depuies to leave while they searched the house. Simply put, the important protections afforded in *Jordan* to case workers who actually defer to police officer judgment simply do not apply here.

[6]The parties agree that the official capacity claims against Defendant Wade are duplicative of the claims against Hickman County, and, therefore, should be dismissed. (Docket No. 54 Ex. 1 at 7; *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003)). Also, in responding to the County Defendants' motion, the plaintiffs argue that the County Defendants could have liability under the Fourteenth Amendment for assisting with the DCS investigation that violated the plaintiffs' rights to familial association. (Docket No. 54 Ex. 1 at 8-9.) As there is no evidence that the child abuse investigation was conducted in bad faith or with malicious motive, liability against any defendant for violation of the plaintiffs' "familial association" rights is not appropriate. Therefore, the only potential source of liability for the County Defendants arises out of the Fourth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

14

quotation omitted).

While not disputing that warrantless entries are generally not permissible, the County Defendants argue that Wade's intrusion into the home does not rise to the level of a constitutional violation because it was "consensual, *de minimis*, and not unreasonable." (Docket No. 51 Ex. 1 at 7.) None of these justifications is persuasive.

### i. Consent

The County Defendants claim that, "by the time Officer Wade stepped inside the house, DCS employees were setting up interviews of the Plaintiffs' children with the consent and direction of the Plaintiffs," and, therefore, Wade's "momentary" entry into the house cannot be considered an impermissible "search" but must be considered a consensual entrance into an "open" home. (*Id.* at 10-11; *see also U.S. v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981)(finding "free and voluntary" consent to search waives the warrant requirement)). The County Defendants concede that whether consent has been freely given is necessarily a question of fact based upon all of the circumstances, but they argue that, in light of the fact that Wade exhibited no force, the plaintiffs never asked Wade to leave the premises, and the plaintiffs "did not make an attempt to prevent the Hickman County Sheriff's Department officers from entering [the] house," Wade's entry must be considered consensual as a matter of law. (*Id.* at 13-14 citing *e.g. U.S. v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005)(finding that the difference between consensual entry and "impermissible constructive entry" often turns on the degree of force used by police)).

Viewing the facts in the light most favorable to the plaintiffs, after Mr. Andrews explicitly told the officers that they were not permitted to enter the house, the officers, as soon as

Mr. Andrews opened the door, "flooded" in after Mr. Andrews. In light of this, a reasonable jury could find that Wade was not inside the plaintiffs' home with the consent of the plaintiffs and that the plaintiffs only allowed the officers and DCS employees to enter and remain in the house because they feared the authority of armed police officers. Indeed, by the time that the defendants were in the plaintiffs' home, they had already (1) aggressively flashed their badges, (2) told Mr. Andrews that he could not re-enter his home without the police, and (3) violated the plaintiffs' request to not enter the home. The consent argument is without merit.

### ii. *De minimis*

The County Defendants point out that, while on the plaintiffs' property, Wade did not interview the children, give orders, draw his weapon, or otherwise do anything more than "ensure the safety of the DCS employees," and, therefore, any constitutional violation here must be considered a "*de minimis* intrusion into the Plaintiffs' residence." (*Id.* at 7-8, 11-13.) While the County Defendants provide a series of cases indicating that, in certain circumstances, very minor constitutional violations may be excused, none of those citations stands for the proposition that an officer, without a warrant and without an exception to the warrant requirement, may enter an individual's home in conjunction with a criminal investigation. (*Id.* at 11-12 citing *e.g. U.S. v. Jacobsen*, 466 U.S. 109, 125 (1984)(destruction of a small amount of cocaine for a field test was a *de minimis* seizure but, "where more substantial invasions of constitutionally protected interests are involved, a warrantless search or seizure is unreasonable in the absence of exigent circumstances").

Moreover, viewing the facts in the light most favorable to the plaintiffs, Wade did not briefly "cross[] through the plaintiffs' doorway," but he "flooded" into the plaintiffs' home

without a warrant and remained there, by his own admission "for a few minutes," monitoring the plaintiffs and, in some sense, allowing the DCS officers to separate the plaintiffs from the children and making sure that the children were placed in the rooms for the DCS interviews. Again, the facts suggest that Wade came into the plaintiffs' private, "sanctified," space, and remained there for a period significantly longer than "momentary."[7] In light of all of this, the County Defendants' "*de minimis*" argument is without merit.[8]

### iii. Reasonableness

The County Defendants' only support for the proposition that Wade's intrusion can be excused because it was "not unreasonable" is the *Scott v. United States*, 436 U.S. 128, 138 (1978) case, in which the Supreme Court concluded that an officer's subjective rationale for detaining an individual was irrelevant if the detention was objectively justified. This case clearly does not excuse intrusions into homes that occur without a warrant or an exception to the warrant requirement, which, as the Sixth Circuit recognized in *Thomas*, are unreasonable. 430 F.3d at 277.

---

[7]The County Defendants suggest that the plaintiffs were not even aware of Wade's presence in the home because "the only person who testifies that Officer Wade walked inside the house is Officer Wade." (Docket No. 51 Ex. 1 at 12.) The plaintiffs have clearly testified and asserted that both officers came into the house. (Docket No. 54 Ex. 8 at 47-51; Docket No. 54 Ex. 9 at 28.)

[8]The County Defendants' suggestion that Wade is absolved from Fourth Amendment/Section 1983 liability because he just "stood around" in the house and did not conduct a "search" is also unavailing. As the Sixth Circuit has recognized, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Thomas*, 430 F.3d at 277 (internal citation and quotation omitted).

A reasonable jury could conclude that defendant Wade entered the plaintiff's "sanctified" private space without a warrant and that there is no applicable exception to the warrant requirement. Given this and the fact that the warrant requirement is indisputably clearly established by controlling case law, Wade is not entitled to qualified immunity, and his motion for summary judgment on the Fourth Amendment aspect of the plaintiffs' claim will be denied.

### B. Hickman County

As noted above, the plaintiffs also assert a claim of municipal liability against Hickman County under Section 1983. To set forth a "cognizable Section 1983 claim against a municipality, a plaintiff must allege that (1) agents of the municipality, while acting under color of state law, (2) violated the plaintiff's constitutional rights, and (3) that a municipal policy or policy of inaction was the moving force behind the violation." *Memphis, Tennessee Area Local v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004).

Here, clearly, the first two elements of the test are sufficiently satisfied, in light of the alleged Fourth Amendment violations. The plaintiffs' argument fails on the "policy" prong, however. Despite the requirement that the plaintiffs come forth with evidence to raise a genuine issue of fact, the plaintiffs, in briefing, simply state that they "allege that Defendant Hickman County operates under a custom or policy which allows DCS worker[s] to call for 'assistance' from the Sheriff's Department and receive an armed escort with only a phone call. There is no showing of urgency or threat of harm for the Sheriff's Department to comply with these requests." (Docket No. 54 Ex. 1 at 2.) Without evidence, the plaintiffs then allege that the purpose of this policy is "to allow the DCS workers unconstitutional access to minor children

18

under the perceived threat of armed officers inside the home." (*Id.* at 12.)

These statements are purely conclusory. While Wright testified that Hickman County officers responded to her requests for assistance, the plaintiffs have failed to show anything resembling a Hickman County policy or custom in that respect. Moreover, even if there was a Hickman County custom or policy that dictated that police officers must assist DCS officers in their site visit requests, there is no reason to believe that such a policy would be the "moving force" behind constitutional violations that the officers or DCS agents might commit. Certainly, it would be reasonable policy to assume that DCS agents and police officers, working together or separately, would comply with the dictates of the Fourth Amendment, such as the requirement to obtain consent prior to entering the property without a warrant. The mere allegation that Hickman County allows or instructs police officers to join DCS agents on site visits when the agents so request cannot, as a matter of law, be considered the "moving force" behind any constitutional violation here.[9] Therefore, the claims against Hickman County will be dismissed.

### C. Abuse of Process/Civil Conspiracy Claims

Judge Echols dismissed these claims against the State Defendants because the plaintiffs' Complaint failed to allege either of the two basic elements of abuse of process (an ulterior motive and "an act in the use of process other than such as would be proper in the regular prosecution of the charge") and because, absent a valid claim for abuse of process, a civil conspiracy based upon that claim would not be viable. (Docket No. 31 at 9-10 citing *Givens v.*

---

[9]The County Defendants argued that there was no evidence to support the plaintiffs' supervisory liability claim against Hickman County (Docket No. 51 Ex. 1 at 16), and the plaintiffs did not respond to this argument, and, therefore, this claim is abandoned.

*Mullikin*, 75 S.W.3d 383, 400 (Tenn. 2002)). Now, the County Defendants, among other things, argue that these rationales for dismissal apply to them as well.[10] (Docket No. 51 Ex. 1 at 17; Docket No. 55 at 4-5.)

While the plaintiffs restate their previous arguments that Wade "provided an armament" for DCS and restate the case law on abuse of process, they remain unable to show that this case falls within the "gist" of "abuse of process," and, therefore, that claim will be dismissed. (Docket No. 54 Ex. 1 at 13-14.) As to the civil conspiracy claim, the plaintiffs again, simply restate the legal standard for civil conspiracy ("two or more persons each having knowledge of the other's intent to accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means") and claim "that is exactly what occurred in this matter." (*Id.* at 14 citing *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001)). There is no evidence in the record to suggest that the State Defendants and the County Defendants conspired to violate the plaintiffs' rights, and, therefore, the plaintiffs' conspiracy claims will be dismissed as well.

## CONCLUSION

The plaintiffs' Section 1983/Fourth Amendment claims against the State Defendants and Wade will proceed, and all other remaining claims will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[10] In light of the fact that this issue has essentially been evaluated and resolved by Judge Echol's January 26, 2010 opinion, it is not necessary to reach the County Defendants' other bases for dismissal, including the applicability of the Governmental Tort Liability Act.